IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALEXANDRA L. HIRKO, | ) | CASE NO. 1:15CV580 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Alexandra Hirko ("Hirko") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for child's insurance benefits and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

In 2010, the Social Security Administration determined that Hirko was disabled as a child and granted her SSI benefits; however, these benefits have since ceased. Tr. 27, 85, 72. On March 30, 2012, Hirko filed an application for child's insurance benefits, and on October 10, 2012, an application for SSI, alleging a disability onset date of November 21, 2008. Tr. 27, 196. She alleged disability based on the following: Crohn's disease, ADHD, ankylosing spondylitis, irritable bowel disease, migraines, chronic pain in joints/back, and uvielitis, an eye problem. Tr.

1

88.  After denials by the state agency initially (Tr. 99, 126) and on reconsideration (Tr. 124, 125), Hirko requested an administrative hearing.  Tr. 137.  A hearing was held before Administrative Law Judge ("ALJ") Traci M. Hixson on November 7, 2013.  Tr. 45-79.  In her May 6, 2014, decision (Tr. 27-37), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Hirko can perform, i.e., she is not disabled.  Tr. 36.  Hirko requested review of the ALJ's decision by the Appeals Council (Tr. 17) and, on March 11, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Hirko was born in 1993 and was 18 years old on the date her applications were filed.  Tr. 88.  She has never worked.  Tr. 56.  She graduated from high school and is taking classes at a community college.  Tr. 49, 53.

### B.  Relevant Medical Evidence

In late 2008, Hirko was diagnosed with active Crohn's disease of the distal small intestine. Tr. 351, 371.

On February 3, 2009, Hirko saw Gisela Chelimsky, M.D., with complaints of daily abdominal pain.  Tr. 366.  Dr. Chelimsky prescribed medications, performed blood work, and made referrals.  Tr. 366.  On April 22, 2009, Hirko's mother reported to Dr. Chelimsky that Hirko had rectal bleeding, felt very weak, suffered severe back pain, and was unable to sleep at night.  Tr. 360.  Hirko's mother related that Hirko cannot get caught up with her schoolwork due to fatigue.  Tr. 360.  She also stated that Hirko "did great after the first dose of Remicade."  Tr.

360.  Dr. Chelimsky advised that Hirko's mother see her on a weekly basis to improve
communication, made some modifications to Hirko's medications, and made referrals.  Tr. 360.

On May 5, 2009, Hirko stated that she had no abdominal pain except for the previous
night, her joints were feeling better, but that she still had back pain and constipation.  Tr. 357.
Hirko's mother reported still seeing blood on toilet paper but not in Hirko's stools.  Tr. 357.  Dr.
Chelimsky noted that Hirko's chronic pain syndrome was "doing much better" but that she still
had problems with her bowel movements.  Tr. 357.

On January 13, 2010, Hirko saw Lisa A. Feinburg, M.D., complaining of constipation,
diarrhea, nausea after meals, not being able to eat well, low grade fevers at night, and headaches.
Tr. 405-406.  Dr. Feinburg ordered an EGD and colonoscopy to evaluate her gastrointestinal
("GI") disease activity.  Tr. 406.

On February 8, 2010, Hirko saw Dr. Feinburg again.  Tr. 397.  Her pain level was zero
and, from a GI standpoint, she was doing well and was pain free.  Tr. 397.  She had seen a
pediatric rheumatologist who diagnosed her with active inflammation in her joints stemming
from her Crohn's and who wanted to start her on methotrexate.  Tr. 397.  Hirko had no fever and
her energy levels were improved.  Tr. 398.

On April 12, 2010, Hirko saw Steven J. Spalding, M.D., a pediatric rheumatologist.  Tr.
630.  Dr. Spalding diagnosed Hirko with Crohn's and chronic peripheral and axial joint pain.  Tr.
630.  He noted that his findings were consistent with inflammatory arthritis due to Crohn's.  Tr.
630.  He started Hirko on Methotrexate.  Tr. 630.

On January 4, 2011, Hirko was admitted to Cleveland Clinic Children's Hospital for a
fever.  Tr. 717.  The treatment note reads, "Of primary focus during her hospitalization was her
chronic back pain.  Her mother states that she 'wanted to be admitted so that Rheumatology and

3

GI can come to terms and optimize Ali's medication to control her [C]rohn's.'" Tr. 718.  During her hospital stay she had no gastrointestinal symptoms and complained of occasional headaches and back pain.  Tr. 718.  An MRI showed normal findings and was negative for signs of inflammation or indications of Crohn's disease flare.  Tr. 717, 723.  An MRI of her spine was within normal limits.  Tr. 718.  Hirko was discharged with Cymbalta for chronic pain, Voltaren topical gel, and a referral to a pain management program.  Tr. 718.

On January 10, 2011, Hirko saw Teresa Ruch, M.D., for back pain.  Tr. 691.  She reported that sitting and standing make her pain worse.  Tr. 691.  Sometimes her pain was so severe she was unable to walk.  Tr. 691.  She also complained of fatigue, weight loss, night sweats, nausea, vomiting, gastritis, and abdominal and back pain.  Tr. 691.  Upon examination, Hirko had 5/5 motor strength, intact sensation, symmetrical reflexes, and a normal gait.  Tr. 691.  Dr. Ruch commented that MRI results of Hirko's cervical, thoracic, and lumbar spine were negative except "a little bit of facet arthropathy" on her lumbar end, especially at L4-L5, which she opined was the cause of Hirko's back pain.  Tr. 691.  Dr. Ruch also ordered scoliosis x-rays.  Tr. 691.  Hirko returned to Dr. Ruch on May 16, 2011, to go over her x-ray results; her x-ray showed minimal scoliosis primarily at the lumbar thoracic junction "but nothing that needs any workup or anything else at this point."  Tr. 690.  Dr. Ruch suggested Hirko follow-up in one year.  Tr. 690.

On January 20, 2011, at a follow-up to her hospital visit with her physician, Lori Mahajan, M.D., Hirko reported that, from a GI standpoint, she had been doing fairly well, with no nausea or vomiting, and an improvement in her diarrhea.  Tr. 772.  She reported an increase in back pain.  Tr. 772.  Overall, she reported feeling much better.  Tr. 772.  Relevant physical

examination findings were normal.  Tr. 772.  She indicated that she was not taking Cymbalta and did not wish to restart it.  Tr. 772.

On February 24, 2011, Hirko reported that her pain improved for a time using Humira but that she was again experiencing pain, including "excruciating back pain."  Tr. 768.  She also complained of feeling depleted, being stiff in the morning, and joint pain.  Tr. 767-768.

On March 30, 2011, Hirko saw Dean C. Pahr, D.O., at Lake Health Center for Pain Management.  Tr. 1001.  She complained of abdominal pain and Crohn's associated arthritis symptoms in her knees and back.  Tr. 1001.  Upon examination, Hirko had no pain to direct palpation across her spine; her knees had no redness or swelling; and she had no calf tenderness.  Tr. 1001.  Dr. Pahr prescribed a mild pain patch in place of Hirko's tramadol.  Tr. 1002.

On May 16, 2011, Hirko complained to Dr. Mahajan of a progression in her symptoms including frequent diarrhea, abdominal pain, significant fatigue, and oral ulcers.  Tr. 756.  Her joint symptoms had improved somewhat from using the pain patch.  Tr. 756-757.  Her physical exam findings were normal, including a full range of motion, normal muscle strength and tone, no redness or swelling, and a normal gait.  Tr. 757.

On May 20, 2011, at Lake Health treatment note indicates that Hirko complained of mid to low back pain with provoking factors including "stand/sit too long" and bending.  Tr. 987.  She denied numbness, weakness/radiation, and joint swelling.  Tr. 987.  She reported stiffness in the morning.  Tr. 987.

On June 6, 2011, Hirko reported to Dr. Pahr that her pain patch "has been a big help."  Tr. 999.

Hirko visited Daniel Hofius, D.O., at Lake Health in 2011 and 2012.  On June 20, 2011, she complained of pain in her right foot beginning the day before.  Tr. 1045.  She had no

swelling or bruising and could walk on it.  Tr. 1045.  An x-ray was normal.  Tr. 1045.  On June

30, 2011, she complained of back pain and was diagnosed with a urinary tract infection.  Tr.

1042.

On August 19, 2011, Hirko saw Dr. Pahr and reported doing very well; her father opined

that this is the best she has felt in years.  Tr. 998.  Dr. Pahr advised she continue her pain

medication, her GI care, and her active lifestyle.  Tr. 998.

On August 19, 2011, Morris Levinsohn, M.D., a pediatric neurologist, evaluated Hirko

for a second time (he had previously evaluated her in July 2009).  Tr. 696-699.  Dr. Levinsohn

commented that, in the past several months, Hirko had "done extremely well with a significant

diminution in her headaches with no further evidence for disturbance of sleep architecture."  Tr.

696.  Examination findings were primarily normal.  Tr. 696-697.  Dr. Levinsohn provided Hirko

with education materials for ADHD and provided parent/teacher questionnaires for acquiring

more ADHD data and observations.  Tr. 697.  He concluded. "We will then revisit the question

of these opportunities."  Tr. 697.

On September 29, 2011, Hirko presented to Children's Hospital complaining of

intermittent nausea, vomiting, watery diarrhea, and weight loss over the previous two weeks.  Tr.

735.  An endoscopy revealed stomach erosions that may be consistent with Crohn's disease or

vomiting.  Tr. 735.  Hirko denied joint pain or swelling, back pain, and muscle pain.  Tr. 736.

She reported that her back pain worsened when she was not active and that walking and moving

around improved it.  Tr. 742.  Her pain patch provided "excellent" pain control.  Tr. 742.

On December 16, 2011, Hirko received bilateral L4/5 and L5/S1 lumbar facet injections.

Tr. 989.

On February 9, 2012, Hirko informed Dr. Mahajan that, although she had been advised to continue methotrexate injections weekly, she had not done so since August 2011.  Tr. 727-728.  Hirko stated that overall she had been doing fairly well.  Tr. 728.  She received her last cortisone injection for her lumbosacral pain in December 2011 and, since then, had been able to wean off pain pills and pain patches.  Tr. 728.  She reported an ability to do more things socially and that she no longer had recurrent back pain.  Tr. 728.  She planned to start college and just got a new car.  Tr. 728.  Upon examination, she had normal strength and tone in all extremities, a normal gait, and no gross deficits.  Tr. 728.

On February 20, 2012, Hirko saw Dr. Pahr and reported "very little pain"; that her facet injection helped "tremendously"; and that she is using less pain medication.  Tr. 997.  Dr. Pahr noted that she was functioning at a very high level and was "very active with her senior year and she is looking forward to college."  Tr. 997.  He advised she continue with her medications.  Tr. 997.  On a follow-up visit on April 27, 2012, Hirko reported that she continued to do well as before.  Tr. 996.  Dr. Pahr observed no redness or swelling.  Tr. 996.  He advised she hold off on her medications but keep them available in the event of a flare up.  Tr. 996.

On July 27, 2012, Hirko saw Dr. Hofius complaining of pain in her left knee.  Tr. 1038.  Dr. Hofius assessed likely tendonitis.  Tr. 1038.  On September 6, 2012, Hirko complained of back pain in her upper back and left arm numbness.  Tr. 1036.  Dr. Hofius diagnosed cervical radiculopathy; an MRI was within normal limits.  Tr. 1036.  On September 19, 2012, she complained of being run down, tired, and feverish; she also had a sore throat.  Tr. 1031.  Her blood results were within normal limits; she was assessed as having a viral infection.  Tr. 1031-1035.  On September 25, 2012, Hirko complained of a popping noise in her right hip and knee

swelling.  Tr. 1028-1030.  Her bloodwork was within normal limits and she was given a referral to pediatric rheumatology for an evaluation.  Tr. 1029.

On January 25, 2013, Hirko was admitted to the Children's Hospital for possible Crohn's flare.  Tr. 1058-1065, 1093-1099.  She had been off her medications for six months with one week of intermittent abdominal discomfort and other related issues, including mild blood in her stool, epigastric burning, and vomiting.  Tr. 1060.  Upon examination, Hirko had no current abdominal pain, a full range of motion in her extremities with no problems identified, a normal hip exam, a normal gait, normal and symmetric reflexes, intact gross sensation, and normal motor function.  Tr. 1060.  A colonoscopy and endoscopy returned normal results.  Tr. 1062-1063, 1098-1099.

 On February 4, 2013, Hirko returned to the hospital complaining of vomiting and a headache for one day and heart palpitations and facial flushing for a week.  Tr. 1066-1077, 1095-1097.  Extremities and neurological examinations were unremarkable; she had full range of motion in her extremities, no joint swelling, erythema, warmth or tenderness.  Tr. 1069, 1071. A rheumatology consultation yielded normal test results.  Tr. 1076.  Diagnostic tests of her abdomen, pelvis, sacroiliac joints, and heart were normal.  Tr. 1080, 1083, 1085, 1088-1090.

On March 5, 2013, diagnostic studies demonstrated active Crohn's, i.e. active bleeding, and Dr. Mahajan advised Hirko to resume her medication regimen, which Hirko has ceased in February 2012 because she had done well clinically.  Tr. 1143, 1147.   On April 11, 2013, Hirko saw Dr. Mahajan complaining of intermittent fevers, left knee joint swelling, fatigue, back pain and muscle pain.  Tr. 1147.  She stopped taking her methotrexate upon advice of her primary care physician a few weeks previous and had recently restarted.  Tr. 1147.  She had not used pain patches.  Tr. 1147.  On examination, Hirko had full range of motion in her extremities, and her

neurological findings were normal. Tr. 1148. Dr. Mahajan diagnosed her with small bowel active Crohn's disease, complicated by joint complaints and recurrent fever. Tr. 1148.

On September 13, 2013, Hirko saw Scott Burg, DO., for a rheumatology evaluation. Tr. 1129-1131. She complained of GI and musculoskeletal issues, including in her back and knee. Tr. 1129. She had no fever. Tr. 1130. Hirko had no edema, full and equal motor strength, normal examinations in her upper and lower extremities, and normal cervical and thoracic spine examinations. Tr. 1130. She had tenderness in her lumbar spine upon palpation, but full range of motion and negative straight leg raise testing. Tr. 1130. An endoscopy study was consistent with a clinical history of Crohn's disease. Tr. 1139-1142. Dr. Burg's impression was Crohn's disease and likely related arthralgias/arthritis. Tr. 1131.

On November 19, 2013, Hirko saw Franjo Vladic, M.D., for her Crohn's disease. Tr. 1218-1220. She relayed that she had previously been treated but was currently receiving no treatment. Tr. 1218. She complained of abdominal pain, joint pain, back pain, nausea and vomiting. Tr. 1219. Dr. Vladic noted, "[Hirko] predominately has arthralgia symptoms. Per patient these have responded to biological treatment but to Remicade only." Tr. 1220. He referred her to a rheumatologist. Tr. 1220. On December 17, 2013, Dr. Vladic noted that Hirko had not yet seen the rheumatologist and advised that she discuss Remicade treatment with him. Tr. 1215.

In January 2014, rheumatologist David Mandel, M.D., evaluated Hirko for history of polyarthralgias and myalgias. Tr. 1152-1154. Dr. Mandel noted, "On x-rays there are said to be changes of inflammatory arthritis." Tr. 1152. Upon examination, Hirko was afebrile. Tr. 1153. She had some tenderness and soreness in her elbow and wrist and tenderness to palpation over her lower lumbar spine and ischial bursa; she had no effusion of her knees or ankles. Tr. 1153.

Dr. Mandel recommended Hirko begin treatment with Remicade again, noting that she had an excellent clinical response to that medication in the past, despite a side effect of a transient rash. Tr. 1153.

On April 4, 2014, Dr. Mandel commented that Hirko had had three infusions of Remicade and was tolerating it well. Tr. 1230.  Hirko reported a fair amount of morning stiffness and swelling in her hands and wrists.  Tr. 1230.  Upon examination, she had tenderness and soreness over her left wrist and tenderness over both third and fourth metacarpal-phalangeal joints.  Tr. 1230.  He increased her dosage of Remicade.  Tr. 1230.

**C.  Medical Opinion Evidence**

 **1.  Treating Source Opinions**

On April 16, 2010, Hirko's treating physician, Simee Malik, M.D., provided a medical opinion.  Tr. 625-626.  Dr. Malik listed Hirko's GI disorders: Crohn's disease, chronic abdominal pain/nausea, severe debilitating back pain, recurrent unexplained fevers, fatigue, and chronic headaches.  Tr. 625.  She listed Hirko's clinical abnormalities: postural orthostatic tachycardia syndrome ("POTS"), low amino acids, severe back pain, weakness, joint pain, and malaise.  Tr. 626.  Dr. Malik also recounted weakness and numbness in Hirko's back, knees, and elbows, and opined that Hirko is unable to withstand upright positions for long periods of time and unable to walk distances.  Tr. 626.  Dr. Malik noted that Hirko uses a back brace for support. Tr. 626.

On March 11, 2013, Dr. Mahajan wrote a letter addressed to Hirko's school.  Tr. 1256. She explained, "Hirko might experience flares of her disease which might result in some unexpected missed days of school.  As symptoms can arise suddenly, [Hirko] might require last

minute scheduling of doctor's appointments or testing which might interfere with her attending school as expected." Tr. 1256.

### 2. Consultative Examiner

On November 19, 2012, Dorothy Bradford, M.D., evaluated Hirko at the request of the state agency. Tr. 1049-1057. Hirko complained of Crohn's disease, ankylosing spondylosis, ADHD, Ehlers-Danlos syndrome, migraine headaches, and constant back pain. Tr. 1054. Her pain made it difficult to fall asleep. Tr. 1055. She also stated that she had a decreased activity level and felt chronically ill. Tr. 1055. She reported difficulty sitting for more than 20 minutes, walking for more than 15 minutes, and lifting more than five pounds. Tr. 1054. She wore a left knee brace but did not use an ambulatory aid and wore a pain patch continuously and a back support at all times. Tr. 1054. She reported vomiting once a day after eating due to stomach cramping. Tr. 1054. Upon examination, Hirko had normal muscle testing and a normal range of motion except for her left knee; no muscle spasms, muscle atrophy, spasticity, clonus, or primitive reflexes; a normal gait, muscle strength and tone; and no neurological abnormalities. Tr. 1050-1053, 1056-1057. Dr. Bradford opined that Hirko should be restricted to sedentary activity. Tr. 1057.

### 3. State Agency Reviewers

On July 3, 2012, state agency physician Maria Congbalay, M.D., reviewed Hirko's record. Tr. 92-98. Regarding Hirko's physical residual functional capacity ("RFC"), Dr. Congbalay opined that Hirko can lift twenty pounds occasionally and ten pounds frequently; can stand and/or walk about six hours in an eight hour work day; can sit about six hours in an eight hour work day; can frequently climb ramps/stairs, occasionally climb ladders/ropes/scaffolds,

frequently stoop, kneel, crouch and crawl; and should avoid concentrated exposure to hazards. Tr. 95-96.

On November 26, 2012, state agency physician Diane Manos, M.D., affirmed Dr. Congbalay's findings.  Tr. 106-110.

### D.  Testimonial Evidence

### 1.  Hirko's Testimony

Hirko was represented by counsel and testified at the administrative hearing.  Tr. 46-75. She lives in a house with her parents.  Tr. 49.   She was determined by the Agency to be disabled as a child, when she was about 16 ½ years old.  Tr. 71-72.  Since then, her conditions have gotten worse.  Tr. 72.

Hirko has a driver's license and she is able to drive.  Tr. 49.  She testified that she sometimes prepares meals, does laundry, and goes grocery shopping; she is able to push the cart while shopping.  Tr. 50.  She washes dishes and loads the dishwasher.  Tr. 50.

Hirko stated that sometimes she is too stiff in the morning to stand to take a shower and that she has a chair in the bathroom.  Tr. 51.  Her mom sometimes helps with her hair because Hirko's hands are swollen.  Tr. 51.  She has a dog and two cats and she is able to feed them.  Tr. 51.  She does not walk the dog because there are no sidewalks where she lives.  Tr. 51.  She cannot change the litter box.  Tr. 52.  She likes to scrapbook, read, and watch television.  Tr. 52. She belongs to the Crohn's & Colitis Foundation of America, which offers support groups that she attends.  Tr. 52.  She is enrolled in community college.  Tr. 53.

On a typical day, Hirko testified that she gets up around 10:00 or 11:00.  Tr. 54.  It takes her about 10-15 minutes to get up because she is stiff and swollen in the morning.  Tr. 54.  She takes a shower, eats something, and has to go the bathroom a half an hour later.  Tr. 54.  She has

two classes on Wednesday and her classes are 50 minutes long and one hour long with a fifteen minute break.  Tr. 54.  She will either stay on campus to do homework or will go home and take a nap.  Tr. 54-55.  Her naps last for two to six hours.  Tr. 55.  After her nap she will eat something, watch television, and talk to her parents.  Tr. 55.  She may play her Xbox, read a book, and then go to sleep.  Tr. 55.  When she is at home she is in her computer chair or sometimes propped up in bed with pillows behind her back and sometimes under her knees.  Tr. 64.

Hirko explained how her Crohn's disease affects her.  She stated that when she eats she will vomit from an upset stomach.  Tr. 56.  She will rush to the bathroom thirty minutes after eating and there will be blood in the toilet or she has severe pain in her stomach 15-20 minutes after eating.  Tr. 56.  She stated that this is her baseline and that she will have a flare-up that causes her to be in bed all day sleeping and not eating.  Tr. 56-57.  She experiences severe pain in her back or knees or stomach.  Tr. 57.  She gets a flare-up twice every three months.  Tr. 57.  She also gets ulcers in her mouth and her lips swell.  Tr. 69, 70.

Her back pain is from ankylosing spondylitis and she receives back injections that help for a time.  Tr. 57.  She also wears a back brace.  Tr. 57.  Her ankylosing spondylitis also causes her joints to extend farther than they are supposed to in the back of her legs and it causes her to fall.  Tr. 74.  She has a pain patch and pain medication.  Tr. 57.  Her knees get hot and swell up "big" about three to four times a week.  Tr. 58, 73.  She wears a knee brace and props them up with an ice pack or a heating pack.  Tr. 58.  She can sit for no more than a half-hour and stand for no more than 45 minutes without experiencing pain.  Tr. 57.  This occurs daily.  Tr. 57.  She previously had physical therapy, which was helpful, but at that time she was too sick to participate because she had just changed medications.  Tr. 58.  She gets side effects from her

medications including tiredness and nausea.  Tr. 62.  Her medications help her "for the most

part."  Tr. 63.

Hikro testified that she can lift 10-15 pounds without problems.  Tr. 63.  She has some

problems walking.  Tr. 63.  She starts to get lightheaded after walking for longer than a half an

hour.  Tr. 63.  She has no trouble reaching in front of her but has some trouble reaching overhead

because it hurts and she is "kind of like shaky."  Tr. 64.  She has problems gripping and doing so

hurts her knuckles when her hands are swollen and she grips for too long.  Tr. 64.  Sometimes

writing with a pen hurts but she has no trouble using eating utensils and she can sometimes take

tops off jars and bottles.  Tr. 65.  Her hands swell every day, morning and night.  Tr. 65.  She can

use her hands better when they are not swollen.  Tr. 65.  She has difficulty using stairs; it bothers

her knees and back.  Tr. 65.  If she drops something, she can pick it up if she bends her knees.

Tr. 65.  She cannot crawl.  Tr. 66.

### 2. Vocational Expert's Testimony

Vocational Expert William Kiger ("VE") testified at the hearing.  Tr. 75-77.  The ALJ

asked the VE to determine whether a hypothetical individual of Hirko's age and education

could perform work if that person had the following characteristics: can lift and carry 20 pounds

occasionally and 10 pounds frequently; can stand, walk, and sit for six hours, but with a sit/stand

option every hour lasting about five minutes and during which time she would remain at the

workstation; can frequently perform postural activities but never climb ladders, ropes, and

scaffolds; cannot be exposed to hazardous conditions such as unprotected heights and moving

machinery; and can frequently reach in all directions, handle, finger, and feel.  Tr. 75-76.  The

VE answered that such an individual could perform light, unskilled jobs such as cashier (1,100

regional jobs; 170,000 national jobs), information clerk (400 regional jobs; 86,000 national jobs),

and office clerk (900 regional jobs; 125,000 national jobs).  Tr. 76.

Next, the ALJ asked the VE if the individual could work if she had the following

characteristics: can lift 10 pounds occasionally; can stand and walk for two hours, sit for six

hours, with a sit/stand option every hour lasting about five minutes and during which time she

would remain at the workstation; can occasionally perform postural activities but never climb

ladders, ropes, and scaffolds; cannot be exposed to hazardous conditions; can frequently reach in

front and occasionally overhead; and can frequently handle, finger, and feel.  Tr. 76-77.  The VE

replied that such an individual could perform sedentary, unskilled jobs such as

receptionist/information clerk (400 regional jobs; 75,000 national jobs), call-out operator (100

regional jobs; 35,000 national jobs), and order clerk (100 regional jobs; 18,700 national jobs).

Tr. 77.  The ALJ asked whether the jobs mentioned by the VE would be impacted if the

individual required frequent breaks throughout the work day that amounted to three unscheduled

breaks lasting 15 minutes, in addition to a morning, lunch, and afternoon break.  Tr. 77.  The VE

stated that the jobs previously mentioned would be eliminated and that there would be no other

jobs for such an individual.  Tr. 77.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to
perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her May 6, 2014, decision, the ALJ made the following findings:

1.   Born on December 12, 1993, the claimant had not attained age 22 as of
     November 21, 2008, the alleged onset date.  Tr. 29.

2.   The claimant has not engaged in substantial gainful activity since
     November 21, 2008, the alleged onset date.  Tr. 29.

3.   The claimant has the following severe impairments: Crohn's disease with
     inflammatory arthritis, migraine headaches, patella femoral syndrome,
     and chronic pain syndrome.  Tr. 30.

4.   The claimant does not have an impairment or combination of
     impairments that meets or medically equals the severity of one of the
     listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 31.

5.   The claimant has the residual functional capacity to perform sedentary
     work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can
     carry ten pounds occasionally; she can stand or walk for two hours and sit
     for six hours, with a sit/stand option every hour for five minutes; she can
     never climb ladders, ropes, or scaffolds, and she can occasionally climb
     ramps and stairs, balance, stoop, kneel, crawl, or crouch; she can
     frequently reach in front and occasionally overhead; she can frequently
     handle, finger, and feel; she must avoid all exposure to hazards.  Tr. 32.

6.   The claimant has no past relevant work.  Tr. 35.

7.   The claimant was born on December 12, 1993 and was 14 years old,
     which is defined as a younger individual age 18-44, on the alleged
     disability onset date.  Tr. 36.

8.   The claimant has at least a high school education and is able to
     communicate in English.  Tr. 36.

9.   Transferability of job skills is not an issue because the claimant does not
     have past relevant work.  Tr. 36.

10.  Considering the claimant's age, education, work experience, and residual
     functional capacity, there are jobs that exist in significant numbers in the
     national economy that the claimant can perform.  Tr. 36.

11.     The claimant has not been under a disability, as defined in the Social
        Security Act, from November 21, 2008, through the date of this decision.
        Tr. 37.

## V. Parties' Arguments

Hirko objects to the ALJ's decision on two grounds.  She argues that the ALJ erred at Step Three in failing to consider whether her inflammatory arthritis met or equaled Listing 14.09D, and that the ALJ failed to properly evaluate opinions from other sources found in the record.  Doc. 14, p. 12.  In response, the Commissioner submits that substantial evidence supports the ALJ's Step Three determination and her consideration of the evidence.  Doc. 16, pp. 9-14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not err in her Step Three determination

At Step Three, an ALJ considers whether the claimant has an impairment that meets or

equals one of the listings in the Listing of Impairments. 20 C.F.R. §404.1520(a)(4)(iii). A

claimant must meet all of the specified medical criteria to show that her impairment matches an

impairment in the Listings; an impairment that manifests only some of those criteria, no matter

how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Hirko argues that the ALJ erred because she "failed to conduct a meaningful review of

the medical evidence of Hirko's inflammatory arthritis in light of Listing 14.09(D)." Doc, 14, p.

13.  She asserts that the ALJ "considered only Listing 14.09 in a fleeting reference to the Listings

criteria . . . . Conspicuously missing from the ALJ's decision was any discussion of whether

Hirko met or equaled a Listing under section 14.09(B) and 14.09(D)." Doc. 14, p. 14.

Listing 14.09 states,

Inflammatory arthritis. [] With:

\*      \*      \*

    B. Inflammation or deformity in one or more major peripheral joints with:
        1. Involvement of two or more organs/body systems with one of the
organs/body systems involved to at least a moderate level of severity; and
        2. At least two of the constitutional symptoms or signs (severe fatigue,
fever, malaise, or involuntary weight loss).
or

\*      \*      \*

    D. Repeated manifestations of inflammatory arthritis, with at least two of the
constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight
loss) and one of the following at the marked level:
        1. Limitation of activities of daily living.
        2. Limitation in maintaining social functioning.
        3. Limitation in completing tasks in a timely manner due to deficiencies in
concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App.1.

In considering whether Hirko met or medically equaled a Listing at Step Three, the ALJ

explained,

The claimant is able to ambulate effectively, and her patella femoral syndrome does not meet Listing 1.02 (gross dysfunction of a joint).

The claimant's Crohn's does not result in obstruction or complications at the level of Listing 5.06, inflammatory bowel disease.  Nor does the related arthritis meet Listing 14.09 for inflammatory arthritis.  Although claimant's medical history reflects a diagnosis of ankylosing spondylitis, more recent MRIs have not shown this condition.  Further, the record does not support claimant having an inability to ambulate effectively or the inability to perform fine and gross movements effectively.  Claimant's medical records do not establish persistent inflammation or persistent deformity of any major joint.

The claimant's migraines and chronic pain syndrome were considered under Listing 12.07, somatoform disorders.  This Listing is not met because claimant has not demonstrated marked restriction of activities of daily living or marked difficulties in maintaining social functioning or concentrations, persistence, or pace, and there have not been repeated episodes of decompensation, each of extended duration.

Tr. 32.

The ALJ's failure to mention Listing 14.09B or 14.09D specifically is not reversible error where, as here, the ALJ adequately discussed Listing 14.09 generally.  Hirko cites *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x. 411, 416 (6th Cir. 2011), in support of her argument, Doc. 14, p. 14, but *Reynolds* is distinguishable.  In *Reynolds*, the ALJ determined that the claimant had severe mental and physical impairments, "conducted a thorough analysis" of her mental impairment, but provided "[n]o analysis whatsoever" with respect to the claimant's physical impairments.  *Id.* at 415-416.  The Sixth Circuit stated that the ALJ "needed to actually evaluate the evidence, compare it to section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful review."  *Id.* at 416.  Here, in contrast, the ALJ discussed Hirko's physical impairments at Step Three, compared them to numerous listings, including Listing 14.09, and gave an explained conclusion for her finding that Hirko's impairments did not meet or equal Listing 14.09.

Hirko does not describe evidence in the record indicating that she can meet or medically equal Listing 14.09B.  She only argues that evidence in the record supports a finding that she meets Listing 14.09D.  In support of this argument, she states that she has Crohn's disease, "which is commonly associated with inflammatory arthritis."  Doc. 14, p. 15.  She asserts that she has had "repeated manifestations of inflammatory arthritis with recurrent back pain, knee pain, hip pain, and elbow pain."  Doc. 14, p. 15.  A diagnosis, alone, is not sufficient to establish disability; the claimant must also establish that her condition is disabling.  *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988).  Moreover, in order to meet Listing 14.09D, a claimant must have a marked limitation in activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  *See* 20 C.F.R. Pt. 404, Subpt. P, App.1.  The ALJ explained, when considering Listing 12.07, that Hirko did not demonstrate that she had marked limitations of activities of daily living, maintaining social functioning, or concentration, persistence and pace.  Tr. 32.  Thus, the ALJ's failure to mention, specifically, Listing 14.09D was not error; Hirko cannot show that she meets the requirements of Listing 14.09D.  *See Zebley*, 493 U.S. at 530 (claimant must meet all of the specified medical criteria to meet a listing).

Furthermore, the ALJ's failure to refer specifically to Listings 14.09B and 14.09D is not error because elsewhere in her opinion the ALJ discussed substantial evidence demonstrating that Hirko does not meet or equal those Listings.  *See Beldsoe v. Barnhar*, 165 Fed. App'x 408, 411 (6th Cir. 2006) (ALJ did not err when he failed to spell out every consideration that went into a Step Three analysis when the ALJ described pertinent evidence elsewhere in the decision); *Hufstetler v. Comm'r of Soc. Sec*., 2011 WL 2461339, *10 (N.D. Ohio June 17, 2011) (affirming the Commissioner's decision when the ALJ did not specifically discuss a listing at Step Three

but provided sufficient analysis at Step Four for the court to determine that no reasonable fact finder would have decided the matter differently). The ALJ exhaustively documented Hirko's records of her treatment of Crohn's disease and her joint issues.  Tr. 33-35.  With respect to Hirko's joint issues, the ALJ observed that diagnostic tests were repeatedly normal.  Tr. 33 (MRI of back was normal in January 2011; spine x-ray in May 2011 showed mild scoliosis; MRI in September 2012 was normal).  She commented that physical examinations were, by and large, normal.  Tr. 35; Tr. 33 (May 2011 exam showed normal gait, full strength and sensation, and symmetrical reflexes; mild tenderness in her knee on July 27, 2012; some paracervical tenderness and paresthesias in her left upper arm, but a good range of motion in her neck and shoulder in September 2012); Tr. 34 (January 2013 exam showed full range of motion in all extremities, normal gait, intact sensation, and normal muscle tone, bulk, and strength; September 2013 exam showed full strength and range of motion and tenderness in her lumbar spine; some tenderness in January 2014 but no effusion in her knees or ankles; normal exam in November 2012  except reduced flexion and extension in Hirko's left knee, otherwise full and painless range of motion in her upper extremities and normal stability, strength and tone in her lower extremities).  The ALJ remarked that Hirko's pain was effectively managed with treatment, Tr. 35, 33 (chronic back pain in January 2011 managed with oxycodone and toradol when admitted to the ER; Hirko was referred to pain management, began treatment, and reported her pain was low and that she was functioning at a high level in February 2012; she reported mild pain in April 2012, despite not taking prescribed Vicodin), and that, in some cases, Hirko was not compliant with treatment, Tr. 35 (noting multiple referrals to physical therapy with no follow-up.  The ALJ recognized that Hirko "has periodic episodes of decline," but that these symptoms are attributed to lack of treatment.  Tr. 35 (noting that, during one such episode, in April 2013,

Hirko had stopped taking methotrexate and had stopped using pain patches; remarking that Hirko received no treatment for Crohn's disease for up to one year because she was doing so well). Overall, the ALJ noted that Hirko had substantially recovered from the severe form of Crohn's disease that she had as a child and that more current exams showed no active Crohn's.  Tr. 35. The ALJ concluded, "with treatment, [Hirko] is able to reduce her symptoms to the point that she feels so well, she does not believe she needs treatment."  Tr. 35.  She gave great weight to state agency reviewing physician Dr. Manos, who limited Hirko to light work, but the ALJ further limited Hirko to sedentary work and frequent postural activities based on Hirko's testimony and consultative examiner Dr. Bradford's opinion, to which the ALJ gave substantial weight.  Tr. 34. All told, the ALJ fully evaluated Hirko's physical impairments and her failure to specifically cite Listing 14.09B or 14.09D at Step Three is not error.

### B.  The ALJ's failure to cite other source opinions is not error

Hirko argues, "The ALJ failed to consider and assign weight to the opinions of Hirko's guidance counselor Megan Schoene-Feaster, school records, and other third party statements." Doc. 14, p. 18.  She asserts that the ALJ is required to consider every opinion in the record and that her failure to mention these "third party opinions" is reversible error.  Tr. 14, p. 21.  Hirko identifies the following opinions, records, and statements: a report from Schoene-Feaster that Hirko missed school due to her medical conditions; Hirko's Section 504 Plan;[2] a letter from Schoene-Feaster indicating that, throughout Hikro's time in high school, she was out of school for days because of her medical conditions; a letter from Hirko's grandmother stating that Hirko is unable to work; a letter from Hirko's friend detailing the symptoms he witnessed Hirko suffer;

---

[2]  A Section 504 Plan is implemented by schools and sets forth specific accommodations for a student with a mental or physical impairment.  *See* Tr. 1015-1016.

and a letter from Hirko's father describing her symptoms and opining that she is unable to work. Doc. 14, pp. 20-21.

An ALJ is not required to cite every piece of evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507-508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." (citation omitted)). The evidence cited by Hirko was considered by the ALJ. *See* Tr. 40 (listing evidence in the record, including statements from Hirko's father, grandmother, and friend). The ALJ discussed the fact that Hirko was placed on a 504 Plan at school. Tr. 30. The opinions of Hirko's father and grandmother—that Hirko is unable to work—is a determination reserved for the Commissioner. 20 C.F.R. § 416.927(d)(1) (the Commissioner is responsible for determining whether a claimant is disabled). And the ALJ discussed Hirko's symptoms that were referenced in third-party statements and Hirko's frequent visits to doctors and the hospital that were well-documented. Tr. 33-35. Thus, the opinions and statements do not impact the outcome of Hirko's case. *See* Social Security Ruling 06-03p, 2006 WL 2329939, at *6 ("the adjudicator generally should explain the weight given to opinions from [] 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The ALJ explained that, although Hirko had been previously found disabled, her conditions have since improved with treatment and the evidence supports this conclusion. Tr. 35. The ALJ complied with the regulations and her decision is supported by substantial evidence; her decision, therefore, must be affirmed. *See Jones v.*

*Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (a court must affirm the ALJ's decision if it is supported by substantial evidence).

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 8, 2015

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)